UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

**TAYLOR PETERSON,**

    Plaintiff,

  v.                                          Case No. 22-CV-1106-SCD

**COMMISSIONER OF THE
SOCIAL SECURITY ADMINISTRATION,**

    Defendant.

---

## DECISION AND ORDER

---

      Taylor Peterson applied for disability benefits based on lifelong mental health issues. The commissioner of the Social Security Administration denied the applications, and, after a hearing, an administrative law judge found Peterson capable of working with several restrictions in mental functioning. Peterson seeks judicial review of that decision, arguing that the ALJ erred in evaluating the opinions of his treating psychiatrist and in assessing his limitations in concentrating, persisting, or maintaining pace—CPP in social security lexicon. I agree that the ALJ reversibly erred when analyzing the psychiatrist's opinions. However, because the record does not require a finding of disability, I will reverse the decision denying Peterson disability benefits and remand the matter for further proceedings, rather than order an award of benefits.

## BACKGROUND

      In 2019, Peterson applied for child disability benefits and supplemental security income under Titles II and XVI of the Social Security Act, respectively, claiming that he became disabled in 2000 due to various mental impairments.

I. **Medical Background**

Peterson has suffered from mental health issues his entire life. He was diagnosed with attention-deficit/hyperactivity disorder when he was just four years old. R. 641.[1] He struggled academically, behaviorally, and socially despite receiving special education assistance through an individualized education plan for an emotional-behavioral disability. R. 337–44, 641, 661. He had difficulty staying on task, was very impulsive, and often threatened his classmates. Peterson saw things quite differently, claiming he was the one being bullied and not being accepted by his peers. R. 362, 387, 478, 641, 661. His home life wasn't any better. His parents divorced when he was two, and he reported being physically and verbally abused by his father's girlfriend and often having nightmares and flashbacks about the abuse. R. 337, 348, 387, 398, 401–02, 405, 412, 416, 425, 430, 448, 500, 619–20, 638. Peterson says that he started feeling depressed around age twelve or thirteen. R. 354, 478. He was hospitalized for several weeks with suicidal thoughts when he was fourteen. R. 348, 387, 424–25, 428, 478, 500, 619, 661.

A few years later, Peterson was involved in a serious accident. While riding a motorized bike without a helmet, he collided with a moving pickup truck. *See* R. 333–36, 354, 361–62, 430, 472. Peterson suffered a significant head injury, fractured his ribs and left clavicle, and lacerated his liver. A CT scan revealed a small brain bruise. Peterson was released from the hospital in stable condition, and he returned to school without difficulty. However, his academic, behavioral, and social issues persisted, and he dropped out of school during his sophomore year. R. 52, 67, 85, 354, 363, 430. He tried homeschooling and studying for a GED, but both efforts were short-lived.

---

[1] The transcript is filed on the docket at ECF No. 11-1.

After dropping out of high school, Peterson tried working; however, he was never able to keep a job for very long. He worked as a dishwasher, collecting donations at a department store, at Taco Bell, doing landscaping, and at Subway. *See* R. 52–53, 67, 86–87, 266, 277–82, 330, 363, 472. But his longest time at one job lasted about three months. R. 363. Peterson last worked at a different Subway in 2017. R. 52–53, 67, 264, 401, 407–08, 472. He says they often sent him home early and eventually fired him after only a few days because he was too slow, he asked too many questions, and he was too difficult to train. According to Peterson, he was let go from his other jobs for similar reasons.

Meanwhile, Peterson continued to be evaluated and seek treatment for mental health issues. During a psychological evaluation in 2014, he struggled to maintain attention and concentration and appeared frustrated when completing tasks. R. 347–53. Testing revealed a full-scale IQ score in the low average range and symptoms highly probable for ADHD. The examiner assessed major depressive disorder, generalized anxiety disorder, and a personality disorder. Peterson underwent a comprehensive neuropsychological assessment in August 2016. *See* R. 361–77, 477–91. He reported a long history of low frustration tolerance, impulsivity, fatigue, memory problems, and social anxiety. Testing revealed difficulties in impulsivity, attention, and working memory. The neuropsychologist assessed a cerebral contusion, ADHD, chronic depressive disorder, and characteristics of borderline personality disorder.

In July 2020, Peterson underwent another neuropsychological evaluation. *See* R. 641–45. Testing revealed "a mixed pattern of neurocognitive strengths and weaknesses." R. 643. He performed relatively well across most language measures but struggled with complex visual spatial functioning, nonverbal learning, and memory. The neuropsychologist also noted

3

that Peterson continued to struggle with attention and concentration despite using stimulant medication. He also exhibited deficiencies in social and emotional functioning. Overall, Peterson scored in the twenty-seventh percentile in verbal comprehension, the second percentile in perceptual reasoning, and the seventh percentile in full-scale IQ. The neuropsychologist assessed ADHD, nonverbal learning disorder, and chronic depressive disorder. He noted that, although Peterson struggled to maintain employment in the past, "ongoing work training could be considered." R. 644. According to the neuropsychologist, Peterson "likely would function best in a job that would be relatively routine, unchanging and does not require rapid processing"; that involved tasks "where he could work on his own with close supervision"; and that involved tasks that did not require intact motor skills. *Id.*

Peterson also received ongoing psychiatric care during those years. From 2015 until early 2018, he participated in individual psychotherapy and saw a psychiatrist through the human services department at Winnebago County. *See* R. 400–17. He continued his psychiatric treatment through Fond du Lac County when he moved there with his mother in 2018. *See* R. 423–65. Peterson moved back to Winnebago County several months later and picked up his treatment where he had left off. *See* R. 387–400.

In January 2020, Peterson started seeing Noah Horowitz, a psychiatry specialist then with Ascension Behavioral Health. *See* R. 618–21. He followed-up with Dr. Horowitz about once a month throughout 2020. *See* R. 646–60. In August 2020, Dr. Horowitz wrote a letter in support of Peterson's ongoing disability claim. *See* R. 661. Dr. Horowitz noted that Peterson suffered from autism spectrum disorder, ADHD, depression, post-traumatic stress disorder, and an unspecified neurocognitive disorder. He also observed that Peterson had maladaptive personality traits, he briefly summarized Peterson's medical history, and he detailed the results

4

of the July 2020 neuropsychological evaluation. Dr. Horowitz indicated that Peterson's "social and cognitive deficits [were] likely to be long term impairments" and that "his mood and attention symptoms [had] proved difficult to treat." *Id.* In his opinion, Peterson was not "capable of supporting himself through employment . . . [or] living independently." *Id.*

A few weeks later, Dr. Horowitz completed a mental functional capacity evaluation form submitted by Peterson's disability attorney. *See* R. 663–68. He described his treatment relationship with Peterson, listed Peterson's mental impairments, and summarized the mental health treatment Peterson had received. Dr. Horowitz indicated that Peterson's impairments would substantially interfere with his ability to focus, concentrate, or stay on task such that Peterson would be off task at least twenty percent of the workday. Dr. Horowitz also indicated that Peterson was not able to work on a regular and sustained basis due to impaired concentration and focus, specific cognitive deficits, social impairments, an unstable mood, and an inability to perform or interact with others to competitive standards. He opined that Peterson had a marked limitation in understanding, remembering, or applying information; an extreme limitation in interacting with others; an extreme limitation in concentrating, persisting, or maintaining pace; and an extreme limitation in adapting or managing oneself.[2] He further opined that Peterson met the criteria for several presumptively disabling mental impairments, including a neurocognitive disorder, depression, autism spectrum disorder, and PTSD.

---

[2] These four areas of mental functioning are known as the "paragraph B" criteria. The paragraph B criteria are measured on a five-point scale: none, mild, moderate, marked, and extreme. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(F)(2).

## II. Procedural Background

Peterson applied for disability benefits in early spring 2019. *See* R. 25, 238–43. He alleged disability beginning in October 2000 due to a traumatic brain injury, PTSD, ADHD, anxiety, and severe clinical depression. R. 263–73. Peterson asserted that his impairments significantly affected his memory, caused daily fatigue, and inhibited his ability to focus, persist, and complete tasks. R. 290–94. Peterson also asserted that he was easily overwhelmed and that he struggled interacting with others.

The state agency charged with reviewing the applications on behalf of the Social Security Administration denied Peterson's claim initially and upon his request for reconsideration. *See* R. 98–157. Robert Barthell reviewed the available records at the initial level of review and found that Peterson had severe, but not disabling, depression, anxiety, and neurodevelopmental disorder. R. 106–07, 119–20. Specifically, Dr. Barthell found that Peterson had a moderate limitation in understanding, remembering, or applying information; a mild limitation in interacting with others; a moderate limitation in concentrating, persisting, or maintaining pace; and a mild limitation in adapting or managing oneself. With respect to concentrating, persisting, and maintaining pace, Dr. Barthell found that Peterson was moderately limited in his ability to carry out detailed instructions and maintain attention and concentration for extended periods. R. 109, 122. Given those CPP limitations, Dr. Barthell believed that Peterson would benefit from routine, repetitive duties and work that had natural prompts. Dr. Barthell further indicated that detailed instructions would need to be provided orally or by demonstration.

John Warren reviewed the available records at the reconsideration level and largely agreed with Dr. Barthell's findings. Dr. Warren found that Peterson had severe, but not

6

disabling, depression, anxiety, ADHD, and personality disorder. R. 135–36, 150–51. Dr. Warren agreed with all but one of Dr. Barthell's paragraph B findings; according to Dr. Warren, Peterson had a moderate, rather than a mild, limitation in interacting with others. As for the moderate CPP limitations, Dr. Warren believed that Peterson could sustain the mental demands associated with carrying out simple tasks over the course of the routine workday and workweek within acceptable attention, persistence, and pace tolerances. R. 138–40, 153–55.

After the state agency denied his applications, Peterson appeared with counsel before an ALJ. *See* R. 41–77. Peterson didn't remember his social security number; messed up his birth year; and said he was living with a cat, his mom, and "a little cockroach in the bathroom." R. 50–51. He told the ALJ that he hadn't worked in a few years and that his last employer fired him because he struggled to grasp the job. R. 52–53. He also told the ALJ that he had trouble reading and writing, he was easily fatigued and frustrated, he needed frequent reminders, and he struggled understanding and keeping pace. R. 52–63. And he described having significant issues with relationships, particularly with women. R. 63–65. As for his daily activities, Peterson said that he needed constant reminders to bathe, he didn't know how to cook, he didn't perform any household chores, he didn't watch a lot of TV, he didn't exercise, he didn't shop, he didn't drive, and he struggled socializing with others. R. 53–56. Peterson said he mostly stayed home and did nothing. Peterson's mother also testified at the hearing, and she verified her son's testimony about his work history, his impairments, and his daily activities. *See* R. 66–71. The ALJ also heard testimony from a vocational expert. *See* R. 71–76.

7

In December 2020, the ALJ issued a written decision denying Peterson's applications. *See* R. 22–40. The ALJ considered the disability applications under 20 C.F.R. §§ 404.1520(a) and 416.920(a), which set forth a five-step process for evaluating DIB and SSI claims. *See* R. 26–28. At step one, the ALJ determined that Peterson had not engaged in substantial gainful activity since his alleged onset date, October 1, 2000. R. 28. The ALJ determined at step two that Peterson had eight severe impairments: depression, anxiety disorder, ADHD, personality disorder, learning disorder, autism spectrum disorder, neurocognitive disorder, and PTSD. At step three, the ALJ determined that Peterson did not have an impairment, or a combination of impairments, that met or medically equaled the severity of a presumptively disabling impairment listed in the social security regulations, 20 C.F.R. Part 404, Subpart P, Appendix 1 (i.e., "the listings"). R. 28–30. The ALJ found that Peterson had a moderate limitation in each of the four paragraph B criteria.

The ALJ next assessed Peterson's residual functional capacity—that is, his maximum capabilities despite his limitations. *See* 20 C.F.R. §§ 404.1545(a) and 416.945(a). The ALJ determined that Peterson could perform the full range of work at all exertional levels but with several non-exertional limitations. R. 30–31. Specifically, the ALJ found that Peterson could perform simple, routine, repetitive, non-complex work; could handle occasional change in work routine; could handle occasional interaction with coworkers and supervisors; could not handle any interaction with the public; could not perform tandem or teamwork; and was able to stay on task with standard breaks.

In assessing that RFC, the ALJ considered Peterson's subjective allegations about his impairments, the medical evidence, the prior administrative medical findings, and the medical opinion evidence. *See* R. 30–34. The ALJ did not find persuasive Dr. Horowitz's opinions that

8

Peterson was unable to support himself through employment, was incapable of living independently, and had marked and extreme limitations in the paragraph B criteria. R. 33. Although the ALJ found the reviewing psychologists' findings persuasive, she further limited Peterson to moderate limitations in all areas of mental functioning.

The ALJ then continued with the sequential evaluation process. At step four, the ALJ determined that Peterson did not have any past relevant work. R. 34. The ALJ determined at step five that there were jobs that existed in significant numbers in the national economy that Peterson could perform. R. 34–35. Based on the step-five finding, the ALJ determined that Peterson was not disabled from his alleged onset date through the date of the decision. R. 35.

The Appeals Council denied Peterson's request for review, *see* R. 13–18, making the ALJ's decision a final decision of the Commissioner of the Social Security Administration, *see Loveless v. Colvin*, 810 F.3d 502, 506 (7th Cir. 2016).

In September 2022, Peterson filed this action seeking judicial review of the Commissioner's decision denying his claim for disability benefits under the Social Security Act, 42 U.S.C. § 405(g). *See* ECF No. 1. The matter was reassigned to me after all parties consented to magistrate-judge jurisdiction under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73(b). *See* ECF Nos. 5, 6, 7. Peterson filed a brief in support of his disability claim, ECF No. 14; Kilolo Kijakazi, the Acting Commissioner of the Social Security Administration, filed a brief in support of the ALJ's decision, ECF No. 23; and Peterson filed a reply brief, ECF No. 24.

## APPLICABLE LEGAL STANDARDS

"Judicial review of Administration decisions under the Social Security Act is governed by 42 U.S.C. § 405(g)." *Allord v. Astrue*, 631 F.3d 411, 415 (7th Cir. 2011) (citing *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010)). Pursuant to sentence four of § 405(g), federal courts have

9

the power to affirm, reverse, or modify the Commissioner's decision, with or without remanding the matter for a rehearing. A reviewing court will reverse the Commissioner's decision "only if the ALJ based the denial of benefits on incorrect legal standards or less than substantial evidence." *Martin v. Saul*, 950 F.3d 369, 373 (7th Cir. 2020) (citing *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000)).

"Substantial evidence is not a demanding requirement. It means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Martin*, 950 F.3d at 373 (quoting *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019)). "When reviewing the record, this court may not re-weigh the evidence or substitute its judgment for that of the ALJ." *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004) (citing *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003)). Rather, the court must determine whether the ALJ built an "accurate and logical bridge between the evidence and the result to afford the claimant meaningful judicial review of the administrative findings." *Beardsley v. Colvin*, 758 F.3d 834, 837 (7th Cir. 2014) (citing *Blakes v. Barnhart*, 331 F.3d 565, 569 (7th Cir. 2003); *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001)).

## DISCUSSION

The ALJ determined that Peterson was not disabled because he could work with certain restrictions in mental functioning. Peterson contends that the assessed RFC does not adequately account for all his mental limitations. Specifically, he maintains the ALJ erred in evaluating the medical opinions of his treating psychiatrist, Dr. Horowitz, and in not fully accounting for his moderate limitation in concentrating, persisting, or maintaining pace.

## I. The ALJ Failed to Mention One of Dr. Horowitz's Opinions

Peterson first argues that the ALJ failed to mention Dr. Horowitz's opinion that Peterson's mental impairments satisfied the criteria of several presumptively disabling impairments. I agree. The ALJ expressly considered Dr. Horowitz's opinion that Peterson was "unable to support himself through employment and incapable of living independently." R. 33 (citing Exhibit B17F). The ALJ also considered Dr. Horowitz's opinion that Peterson had marked and extreme limitations in the paragraph B criteria. *See id.* However, Dr. Horowitz also opined that Peterson met the listings for a neurocognitive disorder, depression, autism, and PTSD. *See* R. 665–68. When Peterson's attorney highlighted that opinion at the hearing, the ALJ said she'd take it under consideration. *See* R. 76–77. The ALJ, however, never mentioned Dr. Horowitz's potentially dispositive opinion in her decision. *See* R. 25–35. That was an error, *see Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013), and Kijakazi never attempts to defend this mistake, *see* Def.'s Mem. at 7–10.[3]

## II. The ALJ Reversibly Erred in Evaluating Dr. Horowitz's Other Opinions

Peterson also argues that the ALJ erred in evaluating the medical opinions she did consider. Because Peterson applied for disability benefits on or after March 27, 2017, the ALJ applied the new social security regulations for considering medical opinions. *See* R. 31 (citing 20 C.F.R. §§ 404.1520c and 416.920c). Under the new regulations, the ALJ may not "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s)." 20 C.F.R. §§ 404.1520c(a) and 416.920c(a). Rather, the ALJ must consider the persuasiveness of all medical opinions in the record using five factors: supportability, consistency,

---

[3] The ALJ also failed to mention Dr. Horowitz's opinion that Peterson would be off task at least twenty percent of the workday. *See* R. 664.

relationship with the claimant, specialization, and other factors that tend to support or contradict a medical opinion. *See* 20 C.F.R. §§ 404.1520c(c) and 416.920c(c).

Although an ALJ may consider all five factors, "the most important factors" are supportability and consistency. 20 C.F.R. §§ 404.1520c(a), (b)(2) and 416.920c(a), (b)(2). The supportability factor focuses on what the source brought forth to support his findings: "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) . . . , the more persuasive the medical opinions . . . will be." 20 C.F.R. §§ 404.1520c(c)(1) and 416.920c(c)(1). The consistency factor, on the other hand, compares the source's findings to evidence from other sources: "[t]he more consistent a medical opinion(s) . . . is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) . . . will be." 20 C.F.R. §§ 404.1520c(c)(2) and 416.920c(c)(2). The ALJ must explain in his decision how he considered the supportability and consistency factors for each medical opinion in the record. §§ 404.1520c(b)(2) and 416.920c(b)(2). The ALJ may, but doesn't need to, explain how he considered the other three factors. *Id.*

### A. Supportability

The ALJ found Dr. Horowitz's other opinions unpersuasive because they were "contrary to the records," but she did not address the supportability of those opinions. *See* R. 33. Dr. Horowitz explained on the mental functional capacity evaluation form that Peterson was not able to work on a regular and sustained basis due to impaired concentration and focus, specific cognitive deficits, social impairments, an unstable mood, and an inability to perform or interact with others to competitive standards. R. 664. Dr. Horowitz also attached a letter further explaining the support for his opinions. *See* R. 661. He detailed his

12

treatment relationship with Peterson, his diagnoses, and a brief history of Peterson's impairments and resulting symptoms. He also summarized the findings of Peterson's recent neuropsychological testing, which, according to Dr. Horowitz was consistent with and provided additional support for his opinions. But the ALJ never mentioned these supporting explanations in her decision.

Likewise, although the ALJ cited generally Peterson's treatment with Dr. Horowitz, *see* R. 32 (citing Exhibit B16F/6, 10), she never discussed whether those treatment records supported Dr. Horowitz's opinions. Dr. Horowitz saw Peterson about once a month since January 2020. *See* R. 617–21, 646–60. During those appointments, he consistently observed that Peterson had impaired attention and focus, demonstrated poor eye contact, was socially inappropriate and childlike, exhibited below average intelligence, and had a very negative outlook. Based on his clinical observations, Dr. Horowitz assessed autism spectrum disorder, ADHD, depressive disorder, PTSD, and a neurocognitive disorder. Dr. Horowitz therefore appears to have amply supported his medical opinions.

### B. Consistency

Moreover, substantial evidence does not support the ALJ's finding that Dr. Horowitz's opinions were inconsistent with other evidence in the record. The ALJ identified three alleged inconsistencies. First, the ALJ determined that Dr. Horowitz's autism diagnosis was inconsistent with the 2016 and 2020 neuropsychological evaluations, as neither neuropsychologist diagnosed autism after examining and testing Peterson. R. 33 (citing Exhibits B7F; B15F). The ALJ, however, failed to explain why that inconsistency mattered. The neuropsychologists didn't conclude that Peterson was not on the spectrum. More confusingly, the ALJ listed autism spectrum disorder as one of Peterson's severe impairments,

13

R. 28, and she noted—without citation to the record—that Peterson was diagnosed with the disorder, R. 31. If the ALJ herself accepted Dr. Horowitz's diagnosis, why would the failure of others to assess the disorder detract from Dr. Horowitz's opinions?

Second, the ALJ observed that the 2016 evaluation "focused mainly on ADHD and some memory issues" and that in 2020 neuropsychologist indicated that "work training could be considered with routine unchanging work not requiring rapid processing." R. 33 (citing Exhibits B7F; B15F). The ALJ, however, never explained how those broad observations were inconsistent with Dr. Horowitz's specific opinions. Dr. Horowitz did not base his opined work limitations solely on Peterson's social struggles and autism spectrum features. Rather, he also found that Peterson's impaired concentration and focus, cognitive deficits, and unstable mood contributed to his inability to work on a regular and sustained basis. The neuropsychological evaluations—which found (among other things) difficulties with impulsivity, attention/concentration, and working memory; low frustration tolerance; and frequent negative thoughts—therefore appear consistent with Dr. Horowitz's opinions. *See* R. 477–89, 641–44.

The ALJ also misrepresented and focused too heavily on the 2020 neuropsychologist's statement about Peterson's work capabilities. That neuropsychologist did not conclude, as the ALJ suggested, that all Peterson needed to maintain competitive employment was some job training and a job with few workplace changes. His opinion was much more equivocal, suggesting that Peterson "could" consider ongoing work training and "likely would function best" in a work environment that was relatively routine, did not require rapid processing, and involved tasks that did not require intact motor skills and where Peterson could work on his own with close supervision. R. 644. Thus, like Dr. Horowitz, the neuropsychologist thought

14

that Peterson needed significant work accommodations. But the ALJ never asked the vocational expert whether any jobs existed for a person with those limitations. *See* R. 71–76. The neuropsychologist also noted that Peterson "struggled to maintain employment," R. 644, a fact consistent with Dr. Horowitz's opinions that the ALJ completely ignored. The record shows that Peterson tried working, but his mental struggles prevented him from keeping a job for longer than a few months. *See* R. 52–53, 86–87, 91–92, 264, 266, 294, 479, 641–42, 661.

Third, the ALJ determined that Peterson was not "as limited as reported by Dr. Horowitz." R. 33. To support this finding, the ALJ cited records indicating that Peterson reported going out with his girlfriend, spending time with his cousin, and playing video games. *Id.* (citing Exhibit B5F/27). The ALJ also noted that Peterson had "a supportive fiancé at one point" and, although that relationship did not work out, Peterson "reported wanting to get out more often, visiting friends, and seeing people." R. 33 (citing Exhibit B4F/9, 15, 23).

The ALJ, however, failed to explain how the few notes she cherry-picked from the record contradicted Dr. Horowitz's opinions. The overall record, including notes from therapy sessions, show that Peterson struggled socially—especially with his fiancée and his other girlfriends. *See* R. 63–65, 362, 387–417, 478, 494. Peterson got engaged when he was nineteen to a family friend who moved in with him and his dad because she was having issues at home. R. 349. Peterson says the relationship ended because she made him have a meltdown during which he intentionally banged his head against a wall. R. 64–65. According to Peterson, he hasn't had a good relationship since then. He reported getting easily frustrated, "blacking out," and hitting his girlfriends. R. 362, 413, 478, 494. He also reported resisting intimacy and not knowing how to express his feelings in relationships. R. 63–64. Given these many issues,

15

Peterson's relationships often didn't last very long. Indeed, more recent records indicate that Peterson spent most of his time at home alone. *See* R. 55, 63, 60, 292, 311–12.

Similarly, the ALJ failed to explain how one record noting that Peterson enjoyed playing video games was inconsistent with Dr. Horowitz's opinion that he had an extreme limitation in concentrating, persisting, or maintaining pace. Peterson said that he got easily frustrated playing video games, he usually played alone, he had difficulty playing, and he easily lost interest playing. R. 292, 311, 363, 659. The ALJ, however, did not mention any of these records when assessing whether Peterson's reported activities were consistent with Dr. Horowitz's opinions.

Kijakazi argues that the ALJ adequately explained why she credited the findings of the state-agency reviewing psychologists and discounted Dr. Horowitz's opinions. *See* Def.'s Br. at 3–10. "An ALJ can reject an examining physician's opinion only for reasons supported by substantial evidence in the record; a contradictory opinion of a non-examining physician does not, by itself, suffice." *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003) (citing *Moore v. Barnhart*, 278 F.3d 920, 924 (9th Cir. 2002)). Substantial evidence does not support the ALJ's decision to find the reviewing psychologists' findings more persuasive than those of Peterson's treating psychiatrist. Dr. Horowitz supported his opinions with clinical findings, and those opinions appear at least somewhat consistent with other evidence in the record, including the 2016 and 2020 neuropsychological evaluations. In contrast, the reviewing psychologists did not have the benefit of Dr. Horowitz's treatment records or the 2020 neuropsychological evaluation when they made their findings. *See* R. 100–57.

Moreover, the ALJ concluded without any citation to the record that the reviewing psychologists' findings were consistent with Peterson's improvement with treatment and

16

medication. R. 33. Earlier in the decision, the ALJ noted that Peterson "reported some possible improved concentration from a change in medication" in February 2020. R. 32 (citing Exhibit B16F/6). That same treatment note, however, indicates that Peterson's attention and focus remained impaired, and Dr. Horowitz had to increase the dosage of Peterson's ADHD medication and antidepressant again a few months later. *See* R. 650–51. Also, the neuropsychologist observed in July 2020 that Peterson continued to struggle with attention and concentration *despite the use of stimulant medication*. R. 643. The ALJ did not discuss any of that evidence in her decision or provide any other examples of Peterson's supposed improvement with treatment and medication.

\* \* \*

In sum, the ALJ reversibly erred in evaluating Dr. Horowitz's medical opinions. She failed to mention Dr. Horowitz's opinion that several of Peterson's mental impairments were presumptively disabling. As for the other opinions, the ALJ did not address Dr. Horowitz's supporting findings and explanations, and substantial evidence does not support the ALJ's finding that other evidence in the record contradicted Dr. Horowitz's opinions. Peterson insists that an award of benefits is appropriate here given "the egregious lack of substantial evidence" supporting the ALJ's decision. Pl.'s Reply at 13. The record, however, does not conclusively show that he is disabled. *See Kaminski v. Berryhill*, 894 F.3d 870, 875 (7th Cir. 2018) (explaining that district courts may award benefits only if "the relevant factual issues have been resolved and the record requires a finding of disability"). The appropriate remedy therefore is to remand, not to award benefits.

## CONCLUSION

For all the foregoing reasons, I find that the ALJ reversibly erred in evaluating the medical opinions of Peterson's treating psychiatrist. Thus, the court **REVERSES** the Social Security Commissioner's final decision and **REMANDS** this action to the Commissioner pursuant to sentence four of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), for further proceedings consistent with this decision. On remand, the ALJ should also address Peterson's other claimed error regarding his limitations in concentrating, persisting, and maintaining pace. The clerk of court shall enter judgment accordingly.

**SO ORDERED** this 29th day of September, 2023.

STEPHEN C. DRIES
United States Magistrate Judge